JAMES DONALDSON, Appellant, v. MARY J. KENEGY et al., Appellees.

**PRINCIPAL AND AGENT: The Relation—Evidence.** Whether a party obtaining a loan was the agent of the borrower or of the lender must necessarily depend on the particular facts of each case. How the parties themselves, at the time, regarded the transaction, or in reason ought to have regarded it, is determinative of the question.

*Appeal from Buena Vista District Court.*—N. J. LEE, Judge.

JANUARY 8, 1924.

REHEARING DENIED APRIL 4, 1924.

THIS is an action in equity, to cancel a note and mortgage. The opinion states the facts. There was a judgment dismissing the petition, from which plaintiff appeals.—*Reversed.*

*Bailie & Edson,* for appellant.

*Healy & Breen,* for appellees.

VERMILION, J.—There was no appearance in the court below for E. B. Wells, or E. B. Wells as agent for Mary J. Kenegy. Mary J. Kenegy alone is hereinafter referred to as the defendant.

Prior to the transaction here involved, the plaintiff had

borrowed $4,000 of E. B. Wells, giving his note therefor, secured by mortgage. Wells, who was president of the Marathon Savings Bank, sold and assigned the note and mortgage to the defendant. Before this note was due, plaintiff entered into negotiations with another bank for a loan of $7,000, to be secured by a mortgage on the same land, and called upon Wells to find out if the holder of the first note and mortgage would accept payment before maturity. Wells agreed to ascertain this, and on December 28, 1920, wrote the defendant as follows:

"If Mr. Donaldson should wish to take up his loan would you accept the money. I think that I can get you a better rate than the loan is drawing. Please let me hear from you."

On January 10th, the defendant wrote Wells, saying:

"If Mr. Donaldson can pay off the $4,000.00 this year and if you can lone it out on land first mortgage at 6½ per cent you may. Please let me know at once."

To this Wells replied, on January 12th:

"I note yours of the 10th and I understand that Mr. Donaldson will make arrangements as soon as possible to take up your loan."

On the same day, he wrote plaintiff:

"The party will accept the money on the loan."

In a conversation in January, Wells also told plaintiff that the defendant would accept the money. On January 18th, he wrote Donaldson, asking him to call on him, and on January 31st, he wrote the defendant as follows:

"If you have $3,000.00 that you can loan I can get you 6½% on a first loan for five years. That is Mr. Donaldson wants to get an increase of this amount so that we could put it all in one loan of $7,000.00 and have the full amount draw you the 6½% for the five years."

About the middle of February, Wells told plaintiff he could get the loan of the defendant, if he wanted the $7,000. The plaintiff replied that he had spoken to the other bank about the loan, and would see him again. Plaintiff says:

"I didn't tell him I didn't want him to get the money,— I didn't tell him to get it for me,—I just left it open. I saw Wells once after that. I didn't tell him to go and get the money,—I told him I would wait and see how I came out about

my other loan. I never told Wells to go on and get the money for me. I never wrote to Wells about the loan. After I went to Minnesota, I never wrote to Wells to get the money,—I never did. He sent a letter with the note and mortgage to Minnesota; and after I went to Minnesota, he wrote me I could get the money at 6½ per cent, without commission. I told him I believed I·would take it.''

On February 4th, defendant wrote to the Marathon Savings Bank, saying:

''I understand Mr. Donaldson wants to borrow $3,000.00 more on how much land does he want to put this on. Please explane more plane.''

On the following day, Wells replied to this letter as follows:

''Mr. Donaldson was to get $3,000.00 more on his eighty making $7,000.00 all together. The eighty is worth $300.00 per acre so the security is good. I can get this for you for five years straight at 6½% and he to pay all the expenses. It is a good loan if you can take it. There is nothing against the land only the loan you now have. I can recommend it to you.''

On February 10th, defendant wrote to the Marathon Savings Bank:

''I am expecting that amount in the first of March $3,000.00. How soon would Mr. Donaldson need it. I will let you know in a few days.''

To this, Wells replied the next day:

''I note yours of the 10th and it will be satisfactory to close the loan March 1st. Just let me know if you will take it on that date.''

On February 21st, the plaintiff wrote Wells from Pipestone, Minnesota:

''Warren wrote me that you could get me the money by the 1st of March but didn't mention what interest that she wanted. Let me hear from you stating details at once and obliged.''

To this, Wells, on the following day, replied:

''The party who has your present loan has written that she thinks she can let you have $3,000.00 on March 1st. The rate is to be 6½% as we talked and for five years. I am looking for a letter each day from her and will let you know as soon as I hear. I am sure that this will be a good deal for you.''

On February 25th, defendant wrote the bank:

"I cannot get the $3,000.00 before the 5th day of March. Hope this will be satisfactory for Mr. Donaldson. If you will send papers about that time I will return the old note to you."

On March 3d, Wells wrote the defendant, saying:

"I herewith hand you a release which please sign before a notary public where I have made the check and return with the Donaldson loan and the $3,000.00 and I will have the new loan all ready. This will give us just about time enough for the 5th."

On March 4th, defendant wrote the bank:

"I will send check for $3,000.00 as soon as I receive note and paper and if Mr. Donaldson is ready for it."

Wells, on March 7th, wrote the plaintiff, at Pipestone, Minnesota, as follows:

"I understand you to say that you were coming back here but I guess I must be mistaken. I herewith hand you the new loan papers for you and your wife to sign. You will sign both the mortgage, note and coupons, your wife will only sign the mortgage. As you know the mortgage has to be signed before a notary. You will notice that I have made a check where you are to sign and you sign *James Donaldson* and your wife *Jessie Donaldson*. Now be sure and each sign just that way. The quicker you get the papers back the quicker we can close the loan. You may interest on the present only to the time this loan is closed. Try and get the papers back on the first mail."

On March 9th, plaintiff wrote to Wells, saying:

"You did not state in your letter whether that 6½% included commission or not. But I want to know before these papers are signed. Will be down as soon as I can make arrangements here."

At some time on or before March 7th, Wells received from defendant her check, dated March 5, 1921, for $2,812.20, payable to "E. B. Wells Marathon Savings Bank." The amount, it is conceded, was arrived at by deducting from $3,000 the interest then due on the $4,000 note. On March 9th, the amount of this check was deposited on open account in the Marathon Savings Bank, to the credit of Mary J. Kenegy, the defendant. The letter in which this check was inclosed is not in evidence; but

on March 9th, Wells acknowledged receipt of the check, in a letter to defendant as follows:

"I have yours with the old Donaldson loan papers enclosed also check, Will get you the new papers in a few days."

On March 18th, Wells replied to Donaldson's letter of the 9th, saying:

"Note yours of the 9th, no there is no commission on the loan as I told you sometime ago. The only expenses is for recording and abstract."

The plaintiff and his wife executed and acknowledged the mortgage for $7,000 on March 16th, and he sent the note and mortgage to Wells by his brother-in-law, and on the 19th, Wells wrote the defendant:

"I herewith hand you the coupon note in the Donaldson loan. Will send you the abstract and recorded mortgage in due time."

The mortgage was filed for record March 21st, and is in the hands of the defendant. The plaintiff has never received any part of the $3,000 represented by the $7,000 mortgage, over and above the $4,000 secured by the first mortgage, nor the release of the first mortgage. On April 23, 1921, the Marathon Savings Bank went into the hands of a receiver. The release of the first mortgage was found among the bank's papers by the receiver, and the deposit of $2,812.20 is still in the bank, to defendant's credit. The plaintiff had no knowledge of the deposit until after the receiver was appointed.

It should be stated further that the defendant is a resident of Apple River, Illinois, and had never met either the plaintiff or Wells, prior to the trial. She had transacted some business with the latter by correspondence, prior to this transaction. She had received from Wells, or through the bank of which he was president, the principal and interest due upon another mortgage; had had money on deposit in the bank, and corresponded with Wells about it; had bought the $4,000 note and mortgage of Wells, and received from Wells interest paid on it by plaintiff. She had no correspondence with plaintiff until after the failure of the bank.

The plaintiff testified, in substance, in addition to what has been set out above in connection with the correspondence, that,

while he did not ask Wells to get the loan from the defendant, or to make out the papers, he wanted and expected him to do it, and to look after his interest, to see if the papers were properly prepared, and to send them to him at Pipestone for execution; that nothing was said about who would make out the papers; that he supposed the money would be sent by the one who held the mortgage. Plaintiff at an earlier date had been a customer of the Marathon Savings Bank, but, for a time immediately before this transaction, owing to some disagreement about another matter, had transacted no business with the bank or with Wells.

The plaintiff seeks a cancellation of the $7,000 note and mortgage, for want of consideration. The case presents the question whether Wells, when he received 'the money, was the agent of the defendant, the lender, or of the plaintiff, the borrower. If he received the money as the agent of plaintiff, the plaintiff must stand the loss, and is not entitled to the relief asked; but if he was the agent of the defendant, the plaintiff received no consideration for the note and mortgage, and is entitled to have them canceled.

The difficulty in determining whether an intermediary is the agent of the borrower or the lender is recognized by the authorities. 2 Corpus Juris 446. Each case must be decided upon its own particular circumstances. Among the factors in determining the question, the following circumstances have been given importance. The making or signing by the borrower of an application for the loan has been given great weight. *Thomas v. Desney,* 57 Iowa 58; *Security Co. v. Graybeal,* 85 Iowa 543; *United States Bank v. Burson,* 90 Iowa 191; *Yeoman v. McClenahan,* 190 N. Y. 121 (82 N. E. 1086); *Johnson v. Shattuck,* 67 Ark. 159 (53 S. W. 888); *Owings v. Howington,* 31 Okla. 651 (124 Pac. 1058). That fact has, however, been held, in some instances, not to be controlling. *McLean v. Ficke,* 94 Iowa 283; *Larson v. Lombard Inv. Co.,* 51 Minn. 141 (53 N. W. 179); *Bates v. American Mtg. Co.,* 37 S. C. 88 (21 L. R. A. 340). In some cases, the fact that the borrower has expressly appointed the intermediary as his agent or attorney, has been held decisive. *Land Mtg., I. & A. Co. v. Vinson,* 105 Ala. 389 (17 So. 23); *Land Mtg., I. & A. Co. v. Preston,* 119 Ala. 290

(24 So. 707). In others, however, even this has been held not to be conclusive, where the circumstances indicated that he was, in fact, the agent of the lender, and that the provision was apparently inserted in an application furnished by the lender, for the purpose of avoiding responsibility for the acts of the agent, while securing the benefit of his services. *McLean v. Ficke,* supra; *Larson v. Lombard Inv. Co.,* supra. See, also, *Youtsey v. Union Cent. L. Ins. Co.,* 191 Iowa 1120. The fact that the agent is or is not paid for his services by one or the other of the parties is an important factor. *Thomas v. Desney,* supra; *Stockton v. Watson,* 101 Fed. 490; *Jensen v. Lewis Inv. Co.,* 39 Neb. 371 (58 N. W. 100). The preparing of the necessary instruments is a fact given consideration. *Jensen v. Lewis Inv. Co.,* supra. The course of prior dealing, especially in the case of one engaged in lending money generally or at a distance, is a matter of great importance. *Bates v. American Mtg. Co.,* supra; *Stockton v. Watson,* supra; *Yeoman v. McClenahan,* supra; *Jensen v. Lewis Inv. Co.,* supra.

In the present case, any consideration to be given to these matters must be due, in some instances, to their entire absence from the transaction. No commission was paid to Wells by either party. There is nothing in his prior dealing with either party from which an agency in this transaction can be inferred, or that throws light upon the question, except the fact that the defendant had theretofore had business dealings with Wells, and, since he was the only person engaged in the transaction with whom she had any acquaintance whatever, if she did not rely upon him she relied upon no one to represent her. No application, formal or otherwise, was made by the plaintiff to Wells for the loan. On the contrary, it is plain that the first suggestion that the loan might be obtained from the defendant came from Wells himself, and was apparently made only after he had written the defendant about it on January 31st, and learned from her that she could supply the money. This would indicate that Wells was acting in the interest of the defendant. It may be further observed in this connection that it is not apparent how the plaintiff would be served by borrowing the money from the defendant, when it had been promised to him by the other bank. The defendant had previously expressed her will-

ingness to accept payment of the first mortgage before maturity, if Wells could reloan the money for her. Wells, since he was expecting no compensation from either party, was not seeking to serve his own interest. But it would be a distinct advantage to the defendant to secure, not only the prompt investment of the $4,000 she was expecting from plaintiff, at an increased·rate of interest, but $3,000 additional. This is of some importance, as showing that, while Wells was volunteering his services to both parties, he was, in fact, acting for the interest of the defendant. The correspondence as a whole supports this view.

The fact of agency must be determined from the conduct, the acts, and the declarations of the parties, in the light of the testimony. Donaldson's testimony as to his conversations and transactions with Wells is uncontradicted; the latter was not called as a witness. The defendant had no personal contact with either Donaldson or Wells. Her part in the transaction was entirely by correspondence, and, of necessity, her conduct must be judged by the correspondence. How the parties themselves at the time regarded the transaction and the relation of Wells to it is a most material inquiry, and should be determinative of the question.

The plaintiff requested Wells to ascertain for him if the defendant would accept payment of the $4,000 mortgage. To this extent, Wells doubtless acted for the plaintiff. Beyond that, however, it is, we think, plain, not only from his testimony, but from his conduct, as well, that he was acting for himself, and dealing with Wells as the agent or representative of the defendant. He did not apply to Wells for a loan, and, as we have seen, it was the suggestion of Wells that the loan be secured of the defendant. It is true, plaintiff said, on cross-examination, in answer to a leading question, that he wanted and expected Wells to look after his interest in the matter, to see if the papers were properly prepared. The answer applies, strictly speaking, to the preparation of the papers only, and has no reference to anything more. The mere desire or expectation on his part that Wells would do this, or even more, in the absence of some direction or understanding to that effect, would not make Wells his agent. His testimony as a whole, and his conduct, as well as the correspondence between himself and Wells, clearly indicate that

he was dealing with the latter as the representative of what may be termed an adversary interest, rather than through him as an agent.

When we examine the defendant's conduct, for what light it may throw upon her relations with Wells, the first thing that challenges attention is the fact that, if she was dealing with Wells as the agent of Donaldson, she was conducting an important business transaction with two men whom she had never met, who lived at a distance, and concerning a matter about which she had no knowledge, except that derived from Wells, and over which she had no control, except through Wells. She testifies that she did not send the check for $2,812.20 to Wells until she had received the $7,000 note and mortgage. If this were true, it would be consistent with her present claim that Wells was plaintiff's agent; but she is mistaken as to the fact. Her check was dated March 5th; Wells, on March 9th, acknowledged its receipt; and on the same day it was deposited in the bank. The mortgage, according to Donaldson's testimony, was not executed until March 16th. It was acknowledged, as shown in the notary's certificate, on the same day. On the 19th, Wells sent her the note, and wrote her that he would send the mortgage when recorded. It was filed for record on March 21st. In the face of these inexorable facts, how can it be said that she regarded Wells as Donaldson's agent? If she did so regard him, she forwarded her check for the additional amount she was to lend, to Donaldson's agent, and hence, in effect, to Donaldson, the mortgagor, with no security whatever, and relied entirely on Donaldson and his agent to see that she obtained the note and mortgage to which she was entitled. The defendant is a woman, and probably has had but slight business experience. Her letters to Wells, however, would indicate that she had some knowledge of business affairs and an abundant caution. She had consented to accept the $4,000 before it was due, only upon condition that Wells would reloan it for her; she had required explanation of the proposed new loan to Donaldson, and assurance concerning the sufficiency of the security, before committing herself. Moreover, she had told Wells that she would send the old note and a check for the additional sum to be loaned, when she received the new note and mortgage. She did not, it is true, adhere to

this wise determination. Did she so far depart from the counsels of caution that, before knowing even that the mortgage had been executed, she sent the money to one whom she believed to be the agent of the borrower, and under no obligation whatever to protect her rights, but whose duty it was to guard the interests of the borrower? Or did she, to avoid unnecessary delay, send the money to one whom she relied on as her agent, in the expectation that he would close the transaction for her by turning over the money to the borrower, on delivery of the note and mortgage? We cannot conclude that the defendant, as cautious as her letters show her to be, sent the check to Wells as agent for the plaintiff. Without implying that she possessed the acumen of the modern money lender, what was said by the court in the *McLean* case, supra, of a somewhat similar situation, is, nevertheless, in a measure applicable:

"Ficke conveys the impression that he was quite willing to intrust his money to McLean, or, what would be the same, to Coleman, as McLean's agent, and run the chances of his loan being properly closed. Business men do not so act. Ficke surely would not trust McLean, an entire stranger, with the proceeds of the loan, and leave him to see that the prior mortgage was discharged. It was but natural, however, for him to do as he did—intrust his business to Coleman, whom he had long before appointed agent, having faith in his integrity."

See, also, as indicating the view courts take of such a situation, *Day v. Dages,* 17 Ind. App. 228 (46 N. E. 589); *Larson v. Lombard Inv. Co.,* supra; *Jensen v. Lewis Inv. Co.,* supra; *Gibson v. Davenport,* 29 Ohio 309.

The acts or conduct of Wells cannot be regarded as determining the identity of his principal, any more than his declarations could be received to establish his agency. No matter who his principal was, he could not bind the one for whom he acted, save by an act duly authorized, or within the scope of his employment. The fact, therefore, that he deposited the proceeds of the check to the credit of the defendant does not tend to establish the relation of principal and agent between them. The communications that passed between them, however, are of a different character entirely. By them the relationship could properly be established. Without discussing their letters in further

detail, we are content to say that they are not only consistent with the theory that, in so far as the $7,000 loan was concerned, Wells was the defendant's agent, but they afford affirmative proof of such relationship.  On the other hand, the negotiations between Wells and plaintiff as clearly negative the idea that he was plaintiff's agent in procuring the money.

The question, raised by appellee for the first time in this court, that there is a defect of parties, in that plaintiff's wife is not joined, has been waived.  *Lenoch v. Yoss,* 157 Iowa 314; *Kirkwood v. Perry Town Lot & Imp. Co.,* 178 Iowa 248.

The plaintiff, having received no consideration for the note and mortgage in question, is entitled to have them canceled. The judgment dismissing the petition is reversed, and the cause remanded, with direction to enter a decree as prayed therein.— *Reversed and remanded.*

PRESTON, STEVENS, and DE GRAFF, JJ., concur.